**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARLENE MURDOCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:16-CV-0779-VEH** |
| | ) | |
| **MEDJET ASSISTANCE, LLC, et** | ) | |
| **al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Darlene Murdoch ("Ms. Murdoch") initiated this employment case against her former employer Medjet Assistance, LLC ("Medjet") and its Chief Executive Officer, Roy Berger ("Mr. Berger") on April 21, 2017. (Doc. 1). Ms. Murdoch generally maintains that Mr. Berger sexually harassed her for a period of 6 to 7 months and that Medjet fired her in retaliation for reporting his harassment to Medjet (in a letter from her lawyer) and subsequently filing an EEOC charge about that same alleged conduct. Ms. Murdoch's complaint contains both federal and state law claims:  (1) Title VII sexual harassment against Medjet (Count One); (2) Title VII retaliation against Medjet (Count Two); (3) negligent and/or wanton hiring, retention, training, and supervision against Medjet (Count Three); (4) invasion of privacy

against both Mr. Berger and Medjet (Count Four); (5) assault and battery against both Mr. Berger and Medjet (Count Five); and (6) tort of outrage against both Mr. Berger and Medjet (Count Six).

Pending before the Court is Defendants' Motion for Summary Judgment (doc. 19) (the "Motion") filed on March 10, 2017. The Court has reviewed the parties' filings offered in support of and opposition to the Motion. (Docs. 20, 21, 25-28). For the reasons set out below, the Motion is **GRANTED IN PART** and otherwise **DENIED** or **TERMED** as **MOOT**.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(a). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing

2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## III.  STATEMENT OF FACTS[1]

### A.  Background Facts About Medjet and Mr. Berger

Medjet operates a membership program that provides air medical transport and related services for members who become ill or injured while traveling. AF No. 1.1.[2] The Birmingham-based company employs approximately 24 people. AF No. 1.2. Mr.

---

[1]  Keeping in mind that when deciding a motion for summary judgment the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided this statement simply to place the Court's legal analysis in the context of this particular case or controversy.

[2]  The designation "AF" within this factual background section stands for admitted fact and indicates a fact offered by Defendants that Ms. Murdoch has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case. Under Appendix II of the Court's Uniform Initial Order (doc. 8) entered on July 14, 2016, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). For Ms. Murdoch, more specifically, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Ms. Murdoch has inadequately asserted a dispute over a fact that Defendants have otherwise substantiated with an evidentiary citation, the Court has reviewed the cited evidence and, if it in fact fairly supports Defendants' factual assertion, has accepted Defendants' fact. On the other hand, whenever Ms. Murdoch has adequately disputed a fact offered by Defendants, the Court has reviewed the evidence cited by Ms. Murdoch and, if it in fact fairly supports her factual assertion, has accepted Ms. Murdoch's version. The Court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' statement of undisputed facts as set forth in Doc. 20 and responded to by Ms. Murdoch in Doc. 25. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 1.2) would indicate the second sentence of paragraph 1 of Defendants' statement of undisputed facts is the subject of the Court's citation to the record.

Berger is Medjet's President and Chief Executive Officer. AF No. 1.3. As CEO of Medjet, Mr. Berger has ultimate hiring and firing authority. AAF No. 1.1.[3] Mr. Berger has a reputation within Medjet of being a difficult boss. AAF No. 2.1.

### B.    Ms. Murdoch's Employment with Medjet

Ms. Murdoch was employed by Medjet as its Assistant Controller from August 2014 until August 28, 2015. AF No. 1.4. When Ms. Murdoch began her employment with Medjet, she reported to Michelle Lowery ("Ms. Lowery"), who was employed as the Controller. AF No. 2.1. As the Assistant Controller, Ms. Murdoch was responsible for accounts payable, accounts receivable, preparation of the daily sales report ("DSR"), reconciliation of the DSR on a monthly basis and other duties as needed to assist the Controller. AF No. 2.2. The preparation and reconciliation of the DSR was one of Ms. Murdoch's primary responsibilities. AF No. 2.3.

Ms. Lowery separated from employment with Medjet in mid-December of 2014, leaving Medjet without a Controller for approximately a month. AF No. 3.1. During that month, Ms. Murdoch took on additional responsibilities and reported directly to and worked more closely with Mr. Berger. AF No. 3.2. Ms. Murdoch

---

[3]  The designation "AAF" stands for additional admitted fact and indicates a fact offered by Ms. Murdoch in her opposition to the Motion (doc. 25 at 6-9 ¶¶ 1-7) that is adequately supported by the record and that Defendants have either offered no opposition to or inadequately controverted in their reply. (Doc. 28 at 1-3 ¶¶ 1-8).

performed her duties satisfactorily during that time period, and Mr. Berger decided to give her a pay increase to begin 2015 based upon her willingness to step in as needed after Ms. Lowery's unexpected departure. AF No. 3.3.

On January 12, 2015, Mona Roy (hereinafter "Ms. Roy") became employed as the Controller for Medjet. AF No. 4.1. Ms. Roy had previously been employed by Medjet and, on January 12, 2015 (doc. 21-1 at 4 at 12),[4] was brought back to help restore order to the company's accounting functions, which had suffered due to Ms. Lowery's performance and departure. AF No. 4.2. When Ms. Roy was rehired, it was expected that she would serve as the Controller for a couple of years to supervise Ms. Murdoch and eventually train Ms. Murdoch to take over her duties. AF No. 4.2.

### C.    Medjet's Disciplinary Policy[5]

Concerning Medjet's disciplinary policy, Ms. Roy testified:

> The discipline policy is to document errors, to discuss them with the employee, and when it is of sufficient nature, document it with the employee and have them sign it. Usually there are two people involved. And then termination if the behavior continues or [problems with] performance continues.

---

[4] All initial page references to Doc. 21-1 correspond with the Court's CM/ECF numbering system.

[5] The Court has been unable to locate (and neither side has cited to) any written documents that reflect Medjet's disciplinary policy. At best, the Court has found an excerpt covering "**EQUAL EMPLOYMENT OPPORTUNITY**", "**HARASSMENT**", and other topics unrelated to discipline. (Doc. 21-2 at 30-31).

(Doc. 21-1 at 8 at 25-26).

Whitney Kerr ("Ms. Kerr"), Mr. Berger's Executive Assistant (doc. 26-5 at 3 at 8),[6] testified that she does not believe that Medjet has "a written policy for discipline." (Doc. 26-5 at 9 at 31). Ms. Kerr indicated that "it's usually two days off without pay if you are caught doing something that was wrong or you have not done something that you were supposed to do." *Id.*

Mr. Berger mentioned the use of suspensions in the context of disciplining Ms. Roy. More specifically, Mr. Berger disciplined Ms. Roy once recently and "[t]hrough the years, [he disciplined her] . . . . [p]robably three or four times." (Doc. 21-2 at 21 at 77).[7] In direct response to the question from opposing counsel about whether he recalled, "what the punishment was or would have been?" Mr. Berger stated, "[i]t would have been a couple of days suspension." (Doc. 21-2 at 21 at 77).

His counsel then asked Mr. Berger whether he meant "the one time or other times?" *Id.* Mr. Berger then modified his prior response with a more specific answer for the most recent time and indicated he had no recollection of what discipline he used for the other instances:

---

[6] All initial page references to Doc. 26-5 correspond with the Court's CM/ECF numbering system.

[7] All initial page references to Doc. 21-2 correspond with the Court's CM/ECF numbering system.

I'm talking about the one time was a couple of days suspension recently. Yes. The other times I have no recollection.

*Id.*[8]

### D.    Ms. Murdoch's Job Performance Issues and Discharge

As Ms. Roy stated in her declaration, "[v]ery soon after [she] began supervising [Ms.] Murdoch, [she] recognized that there were deficiencies in [Ms. Murdoch's] performance." (Doc. 21-4 at 2 ¶ 4).[9] More specifically, Ms. Murdoch struggled with prepaid memberships and timely completing the DSR, and she made numerous mistakes, including a major payroll error and an overstatement of cash in a monthly closing. *Id.*

Ms. Roy testified that she had "multiple discussions" with Ms. Murdoch "[a]bout performance issues" and that she "put a lot of notes in [Ms. Murdoch's] file." (Doc. 21-1 at 8 at 25).[10] According to Ms. Roy, Ms. Murdoch "didn't have the attention to detail that [the Assistant Controller] position requires." (*Id.* at 11 at 37). Ms. Roy also indicated that Ms. Murdoch lacked initiative. (*See id.* ("There also has

---

[8] Obviously, Mr. Berger never fired Ms. Roy despite his recollection that he disciplined her multiple times.

[9] All page references to Doc. 21-4 correspond with the Court's CM/ECF numbering system.

[10] The Court acknowledges that Ms. Murdoch denies much of Ms. Roy's testimony on the basis that "[u]p until that time there had been no problems with [her] job performance" and that "she was singled out for discipline." (Doc. 25 at 3 ¶ 5). However, Ms. Murdoch also "does not deny that she made errors during the performance of her job duties." *Id.* In any event, because Ms. Murdoch fails to meet the substance of Ms. Roy's testimony concerning her performance issues head-on, she has inadequately disputed these facts.

to be initiative to look beyond just the immediate.")).

In April of 2015, Ms. Roy realized that Ms. Murdoch "had not applied a payment to a customer, thereby overstating the cash by $15,000 and potentially shorting people on a bonus." (Doc. 21-1 at 7 at 24); (*see also id.* at 20 at 73-74 ("The fact that she didn't realize that, because she balanced the credit cards, that she could have overstated cash by $15,000."); (*id.* at 74 ("It was a Daily Sales Report error that could have impacted all of the employees within the organization.")); (Doc. 21-3 at 92 ("MEMO FOR FILE - Darlene Murdoch" from Ms. Roy dated April 20, 2015, pertaining to Ms. Murdoch's failure to "post a credit card payment to an outstanding invoice")).[11]

At some point during April 2015, Ms. Roy "told [Ms. Murdoch that she] was concerned about her ability to perform the job [of Assistant Controller]" and indicated that Ms. Murdoch should look for another job. (Doc. 21-1 at 10-11 at 36-37; *id.* at 27 at 103); (Doc. 21-4 at 3 ¶ 5). "Mr. Berger did not ask [Ms. Roy] to make that communication to [Ms.] Murdoch." *Id.*

On June 25, 2015, Ms. Roy issued a written disciplinary warning to Ms. Murdoch for failing to timely submit the DSR on June 23, 2015. AF No. 6.2. As the

---

[11] All initial page references to Doc. 21-3 correspond with the Court's CM/ECF numbering system.

"**DETAILS**" section of the form filled out by Ms. Roy explained:

> On June 23, 2015, I discovered that the Sales Report for that day had not been sent. I called [Ms. Murdoch] at 5:00 to let her know that I had not received the DSR. I asked if she had sent it and she said she wasn't sure if she did or not. I asked her to verify that it was sent – it had not been. The report was sent at 5:10 pm.
>
> The DSR is a daily function with the same routine every day.

(Doc. 21-1 at 35).

> This written warning also stated (in boilerplate fashion) at the top of the form:
>
> You are receiving this First Written Warning as a result of the issue(s) described below. Please be aware that this is the first step in MEDJET Assistance's discipline process. We trust that you will correct this matter by improving your performance of your job and/or refraining from the act or omissions that has led to this Warning Notice. Any subsequent Written Warnings will lead to further discipline, up to and including discharge.

(Doc. 21-1 at 35). Ms. Murdoch and Ms. Roy both signed this disciplinary document. *Id.* During her supervision of Ms. Murdoch, Ms. Roy only recalls that one time in June in which Ms. Murdoch had to sign a written warning regarding her poor performance. (Doc. 21-1 at 8 at 25). Further, the record reflects that from the date of Ms. Murdoch's hire until the date of her discharge, she received only one written reprimand. AAF No. 7.1.

Ms. Roy has stated that she "recommended to Mr. Berger that [Ms.] Murdoch be terminated–once in April of 2015 and again on June 25, 2015, when [she] issued

[Ms.] Murdoch a written warning for failing to send the daily sales report." (Doc. 21-4 at 3 ¶ 5). According to Ms. Roy, "Mr. Berger declined those recommendations." *Id.*

Ms. Murdoch responds to the foregoing job-related criticisms by pointing out that she received a salary increase from $36,000 to $40,000 effective January 1, 2015. (Doc. 21-3 at 7 at 23-24); (*see also id.* at 67 ("**COMPENSATION ADJUSTMENT FORM**")). Also, while Ms. Murdoch does not deny that "she made errors during the performance of her job duties" (doc. 25 at 3 ¶ 5), she contends that even though Ms. Roy had been supervising Ms. Murdoch since mid-January 2015, she only began being critical of Ms. Murdoch's job performance in March or April of 2015. AAF No. 6. According to Ms. Murdoch, Ms. Roy's heavy scrutiny coincided with when Mr. Berger learned of her engagement in March 2015. (Doc. 25 at 3 ¶ 5); (*see also* Doc. 21-3 at 47 at 182 (testifying that "the scrutiny of [her] work was just incredible" and that "[Ms. Roy] definitely started it in March"); *id.* at 183 (recalling that "the timing was [Ms. Roy] pressed [her] for information regarding [her] personal life and who was in [her] personal life, and from that time forward, the atmosphere, everything changed at work"); *id.* at 49 at 189-190 ("[A]fter [Mr. Berger] found out that [Ms. Murdoch] was in a personal relationship, he became non-communicative, would not talk to [her], rude, obnoxious. [Her] work was scrutinized. The whole environment

for [her] work life changed.")).

Mr. Berger testified that Ms. Roy told him about Ms. Murdoch's engagement at the "end of March, beginning of April." (Doc. 21-2 at 11 at 38). He further stated that the (disputed) "mutual," "flirtatious banter" with Ms. Murdoch ended when he "found out [that] she was engaged . . . because she had every opportunity to tell [him], and she never did." (Doc. 21-2 at 20 at 75). Ms. Roy has stated that "[a]t no time did Mr. Berger ever instruct, ask or otherwise try to convince [her] to scrutinize [Ms.] Murdoch's work or treat her differently from other employees." (Doc. 21-4 at 2 ¶ 4). Further, Ms. Murdoch has no knowledge of "what [Mr. Berger] told [Ms. Roy]." (Doc. 21-3 at 47 at 183).

In August of 2015, after Medjet had changed credit card servicers, a series of eleven customers should have received credits on their credit card accounts for refunds from Medjet, but the credits were not actually received by the customers. AF No. 8.1. Ms. Murdoch was aware that there was a problem because credits were posted with Medjet, but the refunds were not actually issued by the credit servicer, resulting in an overstated credit in her reconciliation variance statement. AF No. 8.2. Although Ms. Murdoch was monitoring the situation, she failed to alert Ms. Roy to the issue. AF No. 8.3. One of the customers who was expecting a refund made a series of complaints to Medjet and eventually contacted a potential large corporate

customer for Medjet and informed the prospect that he was not satisfied with Medjet's service. AF No. 8.5.

Ms. Roy became aware of Ms. Murdoch's customer-credit mistake in late August and addressed it with her during her performance review on August 25, 2015. AF No. 9.1. Ms. Murdoch acknowledged the mistake during her review and noted that she should have informed Ms. Roy. AF No. 9.2. Ms. Roy considered Ms. Murdoch's August review to be a very poor one. AF No. 9.3.

Mr. Berger did not participate in Ms. Murdoch's performance review, which occurred while he was out of town. AF No. 10.1. Mr. Berger first became aware of the customer-credit error and the resulting customer complaints on the day after the review, August 26, 2015. AF No. 10.2. On August 27, 2015, Mr. Berger "made the decision to terminate [Ms. Murdoch's] employment . . . . [and] communicated the termination decision to [her] on the following day, August 28, 2015." (Doc. 21-5 at 2 ¶ 3).[12]

Ms. Murdoch asserts that Mr. Berger's decision to fire her was because of her lawyer's letter in June 2015 that accused Mr. Berger of sexually harassing her and the EEOC charge filed in August describing the same wrongful conduct. In response, Mr.

---

[12] All page references to Doc. 21-5 correspond with the Court's CM/ECF numbering system.

Berger has stated in his declaration:

> My decision to terminate Ms. Murdoch was not motivated in any way by the fact that Ms. Murdoch had filed a Charge of Discrimination with the Equal Employment Opportunity Commission. I had been aware since late June 2015 that Ms. Murdoch had retained legal counsel and intended to assert a claim of harassment with the EEOC. My decision to terminate Ms. Murdoch was based solely upon her work performance and was precipitated by a specific error in judgment, which she had acknowledged, and which had the potential to cost the company a substantial amount of business.

(Doc. 21-5 at 2 ¶ 3).

> Concerning the August incident more specifically, Mr. Berger explained:

> On August 26, 2015, . . . [Ms.] Roy, advised me about a recent accounting error which resulted in eleven Medjet customers not receiving credits on their credit card accounts for refunds to which they were entitled from Medjet. Based upon the information provided to me by Ms. Roy, it was apparent that Ms. Murdoch had been aware that there was a problem because credits were still outstanding on her reconciliation variance sheet. Despite being aware of the variances, Ms. Murdoch failed to notify Ms. Roy or take any other action to remedy the problem. As a result, the problem was not identified until eleven customers had been adversely affected. Ms. Murdoch's failure to be proactive and address the situation was consistent with prior performance problems which had been reported to me by Ms. Roy.

(Doc. 21-5 at 2-3 ¶ 4).

### E.     Ms. Murdoch's Sexual Harassment Allegations Against Mr. Berger

Ms. Murdoch contends that Mr. Berger took her to lunch and that, during the

lunches, he asked her personal questions about her dating life and marriages. AF No.

12.1. Ms. Murdoch has testified that she told Mr. Berger that she was "uncomfortable" with the questions that he asked her. (Doc. 21-3 at 29 at 111).

Ms. Murdoch and Mr. Berger went to lunch together on three occasions. AF No. 12.2. The first occasion was in August of 2014, the second lunch occurred in October of 2014, and the third and final lunch together was on February 18, 2015. AF No. 12.3.

Ms. Murdoch maintains that, during the first lunch, Mr. Berger told her that he had been in his second marriage for twenty years and that it had been that long since he had sex. AF No. 12.4. During that first lunch and the two subsequent lunches, Ms. Murdoch was not reserved and she told Mr. Berger about her dating life, her three marriages, and her relationships with her family members. AF No. 12.5. After the February 18, 2015 lunch, Ms. Murdoch sent Mr. Berger a text message stating, "You may have taken me to lunch at [Ms. Roy]'s request, but I'm going to pretend it's bc you wanted to." AF No. 12.6. At the end of the text, Ms. Murdoch included a smiley face. AF No. 12.7.

Ms. Murdoch alleges that, during a particular conversation with Mr. Berger, he told her she was very attractive and very datable. AF No. 13.; ADF 2.3.[13]

_____

[13] The designation "ADF" stands for additional disputed fact and indicates a fact offered by Ms. Murdoch in her opposition to the Motion (in a section separate from her additional undisputed facts (doc. 25 at 9-12 ¶¶ 1-7)) that is adequately supported by the record. In their

According to Ms. Murdoch, Mr. Berger one time entered her personal space to stare into her eyes and told her she has beautiful eyes. AF No. 13.2; ADF 2.2. On other occasion he told her she looked good and that he liked what she was wearing. AF No. 13.2. Ms. Murdoch further asserts that Mr. Berger commented that she "looked good" or that she was "hot." ADF No. 1.2. Ms. Murdoch believed it was inappropriate for Mr. Berger to tell her he liked what she was wearing or that she looked nice. AF No. 13.3. However, Ms. Murdoch never told Mr. Berger she was offended by any compliment he gave her. AF No. 13.4.

Although Ms. Murdoch never objected to Mr. Berger's complimenting her on her appearance, she thought it was acceptable to send Mr. Berger messages during the same time frame telling him he was a "very kind and generous boss"; that he had a nice tan; and that things in the office are "just so-so" when he is not there. AF No. 14.1. During the time when Ms. Murdoch claims to have been sexually harassed by Mr. Berger, she regularly sent him unsolicited emails asking him how he was doing or how his travels were going. AF No. 14.2. For example, on February 11, 2015, Ms. Murdoch sent an email to Mr. Berger while he was out of town stating: "Just checking in. Is all as enjoyable there as you had hoped?" AF No. 14.3. Ms. Murdoch

reply, Defendants have not challenged these additional facts concerning Mr. Berger's alleged conduct with respect to Ms. Murdoch and other female employees of Medjet.

ended the message with a smiley face emoji. AF No. 14.4.

Ms. Murdoch complains about several other inappropriate email communications that she received from Mr. Berger. In response to an email from Ms. Murdoch thanking Mr. Berger for a monthly bonus, Mr. Berger responded, "I actually like you, you seem to be my exception, not my rule around here." AAF No. 2.2. Prior to March 2015, Mr. Berger sent many email messages to Ms. Murdoch which Mr. Berger characterized as "flirtatious banter". AAF No. 2.3. Examples include "Look forward to seeing you tomorrow."; "I can handle you."; and "B safe going home and get some rest." AAF No. 2.4.

On another occasion, Ms. Murdoch sent an email to Mr. Berger thanking him for a donation made in honor of her recently deceased mother. AAF No. 2.5. In response to the thank-you email, Mr. Berger wrote, "you can tell me 'in person'". AAF No. 2.6.

Another time, Ms. Murdoch sent an email advising that the computer "G drive" was freezing up to which Mr. Berger responded, "don't you just hate at your age when the G drive freezes up? Greetings from Tampa. Miss me?" AAF No. 2.7.

On another occasion, Ms. Murdoch sent Mr. Berger an email thanking him for another bonus. Ms. Murdoch additionally wrote, "Well I hope my work eventually shows I'm worth it" to which Mr. Berger responded "I want you around…". AAF No.

2.8.

Ms. Murdoch also claims that Mr. Berger looked at her up and down with his eyes… and that "it was evident" to her that he was noticing parts of her body. AF No 15.1. Mr. Berger never asked Ms. Murdoch on a date or asked her to have sex, but she "got that feeling" from something he said one time. AF No. 15.2. Ms. Murdoch cannot remember what Mr. Berger said that gave her that feeling. AF No. 15.3. Mr. Berger testified unequivocally that he never advanced on Ms. Murdoch sexually. AF No. 15.4. Ms. Murdoch never told Mr. Berger that she was bothered by any of his comments or behavior. AF No. 15.5.

Ms. Murdoch claims that she was offended because Mr. Berger sometimes referred to her as "Dear." AF No. 16.1. Ms. Murdoch thought it was inappropriate if Mr. Berger ever used any term of endearment toward her and thought it was sexually inappropriate that he called her "Dear." AF No. 16.2. Ms. Murdoch never told Mr. Berger she was bothered that he called her "Dear." AF No. 16.3.

On March 10, 2015, when Ms. Murdoch was preparing for neck surgery, Mr. Berger texted her to say, "Good luck tomorrow. All will be just fine." AF No. 16.4. Ms. Murdoch replied to Mr. Berger by text saying, "Thank you, Dear" with a smiley face emoji. AF No. 16.5. Ms. Murdoch does not know why she used the sexually-offensive term "Dear" toward Mr. Berger. AF No. 16.6.

Ms. Murdoch alleges that she was offended by Mr. Berger sending her text messages when she was away from work and on weekends. AF No. 17.1; ADF 3.2. Ms. Murdoch never expressed to Mr. Berger that she was offended by him sending her text messages outside of work hours. AF No. 17.2. Ms. Murdoch also regularly sent text messages to Mr. Berger outside of work hours. *Id.* Ms. Murdoch did not maintain any copies of any texts from Mr. Berger which she contends were offensive. AF No. 17.3.

Mr. Berger did maintain text messages between himself and Ms. Murdoch, including the following string started by Ms. Murdoch on February 18, 2015:

> **Darlene**: You may have taken me to lunch at Mona's request but I'm going to pretend its bc you wanted to (smiley face emoji)
> **Roy**: Do you pretend a lot?
> **Darlene**: Oh Geez!
> **Roy**: Bad answer. You know I won't let you get away with that.
> **Darlene**: I have an imagination and that's all I'm saying!

AF No. 17.4. Ms. Murdoch maintains that the two texts sent by Mr. Berger from the above exchange were inappropriate, but that her communications sent to him were fine. AF No. 17.5.

When Mr. Berger was asked during his deposition if he thought that flirtatious banter is appropriate in the workplace, he responded:

> We are a very different kind of workplace, sir. We're a very small organization with 24 or 25 people. By and large we're close-knit as a

family. Honestly it could be construed or conceived as office culture. We're just different. We're not a two- or three-thousand, four-thousand-person operation and whatever flirtatious banter there might have been was absolutely mutual and, I believe in both our opinions [*i.e.*, his and Ms. Murdoch's] not offensive.

(Doc. 21-2 at 9-10 at 32-33).

When asked (in a follow-up question) if he believed, given Medjet's smaller size, that flirtatious banter is acceptable, he answered:

No. I don't believe it's accepted. I believe basically it's the way we're created as a family, it happens. We're all close enough, we're in the same work space, we know a lot about each other both personally and professionally. That's the culture, frankly, that I try to create in an organization.

(Doc. 21-2 at 10 at 33).

In March of 2015, Ms. Murdoch was out of the office for a period of time because of surgery for a tumor in her neck. AF No. 18.1. Ms. Murdoch contends that she was made uncomfortable by Mr. Berger communicating with her that he wanted to come see her while she was out for surgery. AF No. 18.2. The following text string reflects communication between Mr. Berger and Ms. Murdoch while she was out:

**Roy** (March 10):  Good luck tomorrow. All will be just fine.
**Darlene**:  Thank you dear (smiley face emoji)
**Roy**:  If you see this before surgery give Clair my number . . . and ask her to text me when u are in recovery. Thx.

**Roy** (March 11):  Let me know how ur doing if u get ur phone on today.

**Darlene** (March 12):  I'm up and doing ok. Still have bad pain and soreness. They weren't able to get all of the tumor bc of placement so in future if it grows they will use radiation to clear it up.

**Roy**:  That's good, I think. Left you a vm. Call if you get a minute and up to it.

**Roy**:  How are you doing?

**Darlene**:  Just woke up to a nice bouquet of flowers—thank you! Still painful but meds do help.

**Roy**:  Hang. I'll come visit tomorrow. Ok maybe I will just call!

**Darlene**:  Haha you'd laugh if you saw how bad I looked! I'll call when I rouse from drug induced sleep.

**Roy** (March 13):  Good morning. Let me know when u r awake and can take a call.

**Darlene**:  I'm awake but miserable. Couldn't sleep last night and pain is still bad. Not up for chatting just yet. Maybe later in the day after a nap. Thanks for checking on me.

**Roy**:  Hang in.

**Darlene** (March 14):  Is now a good time for a call?

**Roy**:  Give me 30.

**Roy** (March 15):  How r u doing today?

**Darlene**:  About the same. Can't be upright too long before necks (sic) gets tired and hurts but shoulder area is better.

**Roy**:  That's good I guess. Hang in.

AF No. 18.3.

Following those texts, Ms. Murdoch sent Mr. Berger an unsolicited picture of the surgical scar on her neck with the message, "I have a zipper?" AF No. 18.4. Mr. Berger replied by saying, "I can go a million directions with that but won't. Feel better today." AF No. 18.5. In her charge of discrimination filed with the EEOC, Ms.

Murdoch stated that Mr. Berger had replied by saying, "I know what I could do with that zipper." AF No. 18.6.

Upon Ms. Murdoch's return to work post-surgery, Mr. Berger texted to welcome her back and stated, "You got the best return gift you could have—me gone for a week!" AF No. 19.1. Ms. Murdoch replied, "Now you know that's not true for me." AF No. 19.2.

Ms. Murdoch claims that Mr. Berger hugged her on 7 to 10 occasions,[14] including the day she received her job offer and her first day in the office. AF No. 20.1. In each instance she claims that Mr. Berger hugged her from the front with his hands on her back. AF No. 20.2. She does not contend that Mr. Berger ever touched her breasts, genital area or buttocks or that he made any sexual comment during any hug. AF No. 20.3. At no time did Mr. Berger's hugs cause Ms. Murdoch physical pain or did she feel threatened. AF No. 20.4. At no time did Ms. Murdoch ever tell Mr. Berger that she was offended by his hugging or that she did not want him to hug her. AF No. 20.5. While Ms. Murdoch did not prevent any of Mr. Berger's hugs, she did testify that she would "conclude the hug [by] getting out of the embrace quickly." (Doc. 21-3 at 37 at 141).

---

[14] In contrast, Mr. Berger testified that he and Ms. Murdoch "hugged each other." (Doc. 21-2 at 9 at 29). His recollection is that this occurred approximately 4 or 5 times. *Id.*

Ms. Murdoch recalls one of the hugs occurring when she returned to the office after her mother's death and states that Mr. Berger held her in the hug for an extended period of time. AF No. 20.6. Ms. Murdoch believes that Mr. Berger was being sympathetic, but says he could have been sympathetic without hugging her because she doesn't like being touched. AF No. 20.7.

Ms. Murdoch testified about another hug that occurred when she and Mr. Berger "were coming back from . . . the third lunch that [they] had had together." (Doc. 21-3 at 36 at 138). When Ms. Murdoch started walking towards the elevator, Mr. Berger "pulled [her] back by [her] elbow and said, Let's wait." (Doc. 21-3 at 36 at 139). "[They] waited until the empty elevator opened." *Id.* "[They] got into the elevator, and while [they] were in the elevator with the door shut, [Mr. Berger] hugged on [Ms. Murdoch] then." *Id.* Ms. Murdoch indicated that this encounter was no different–in terms of body contact–than Mr. Berger's other hugs. (Doc. 21-3 at 36 at 139). Ms. Murdoch confirmed that she and Mr. Berger were facing each other and that Mr. Berger reached around her back and shoulder area. (*Id.* at 140). Ms. Murdoch described it as a "full body hug" meaning it was "body-to-body contact" and not "a side arm hug" or a "shoulder bump." (Doc. 21-3 at 36 at 139, 140). Prior to this incident in the elevator and before arriving back at the building, Ms. Murdoch grabbed Mr. Berger's hand in the car and said words to the effect of, "I just want to

thank you for being so nice to me and caring about me." AF No. 21.2.

Ms. Murdoch also testified that Mr. Berger hugged and kissed her on the top of her head in her hair twice. (Doc. 21-3 at 35-36 at 136-37). As Ms. Murdoch described one of those instances:

> There was a time that he was going out of town. He came into my office and said, Stand up. I stood up, and he gave me a hug and kissed me on top of my head.

(Doc. 21-3 at 35-36 at 135). Ms. Murdoch did not say anything to Mr. Berger about how his actions made her feel uncomfortable. (Doc. 21-3 at 36 at 137).

The second instance occurred when Ms. Murdoch "was coming back from lunch in the parking lot." *Id.* "[Mr. Berger] was leaving the building." *Id.* "[They] crossed paths and he hugged [Ms. Murdoch] and, again, kissed [her] on the top of the head that day." *Id.* Mr. Berger admits that he has hugged Ms. Murdoch on multiple occasions and has kissed her on the top of her head. AAF No. 3.

As indicated above, Ms. Murdoch testified that "after [Mr. Berger] found out that [Ms. Murdoch] was in a personal relationship, he became non-communicative, would not talk to [her], rude, obnoxious. [Her] work was scrutinized. The whole environment for [her] work life changed." Doc. 21-3 at 49 at 189-190. Mr. Berger agreed that his interaction with Ms. Murdoch changed around this time. More specifically, Mr. Berger testified that the (disputed) "mutual," "flirtatious banter" with

Ms. Murdoch ended when he "found out [that] she was engaged . . . because she had every opportunity to tell [him], and she never did." (Doc. 21-2 at 20 at 75). Citing to this same testimony by Mr. Berger, Ms. Murdoch contends that "[b]y his own words and actions [Mr.] Berger alluded to the fact that he wanted to have sex with [her]." (Doc. 25 at 10 ¶ 3 (citing Doc. 21-2 at 20 at 75-76)).

**F.  Ms. Murdoch's Letter Complaining About Sexual Harassment**

On or about June 25, 2015, Ms. Murdoch's attorney mailed a letter to Mr. Berger and other representatives of Medjet attaching a copy of a draft EEOC charge he intended to file on behalf of Ms. Murdoch alleging sexual harassment.[15] AF No. 22.1. Receipt of that letter a few days after June 25, 2015, was the first knowledge Mr. Berger had that Ms. Murdoch believed she had been subjected to inappropriate treatment. AF No. 22.2; (*see also* Doc. 21-3 at 46 at 180 (Ms. Murdoch's confirming that the letter was dated June 25, 2015)). Prior to her lawyer sending the letter on June

---

[15]  The Court has been unable to locate a copy of this letter from Ms. Murdoch's counsel or the attached draft EEOC charge in the record. Initially, Ms. Murdoch admits that the letter was mailed and that Mr. Berger would have received it a few days after June 25, 2015. However, later in her opposition, she points to Mr. Berger's testimony (doc. 21-2 at 19 at 71) and suggests that "Medjet was notified through [her] counsel that [she] intended to file a Charge of Discrimination with the EEOC" on June 25, 2015 (Doc. 25 at 8-9). Without a copy of that letter, the Court cannot confirm its actual date and/or whether it was sent to Mr. Berger (and others) via regular mail, email, facsimile or some combination thereof. However, the Court agrees with Defendants that, regardless of exactly when Mr. Berger first became aware of the June 25, 2015, letter, "[t]here is no record evidence that Ms. Roy was aware of [Ms. Murdoch's] impending EEOC charge when she issued the written warning [to Ms. Murdoch on June 25, 2015]." (Doc. 28 at 3 ¶ 8).

25, 2015, Ms. Murdoch had never reported to anyone at Medjet that she believed she was being sexually harassed. AF No. 22.3.

## G.    Ms. Murdoch's EEOC Filings

Ms. Murdoch formally filed her first EEOC charge (No. 420-2015-02540) alleging sexual harassment on August 10, 2015 (doc. 1-1 at 2)[16] and attached a one-page summary of the particulars. (*Id.* at 3). This first charge identifies Mr. Berger as Ms. Murdoch's alleged harasser. (*See* Doc. 1-1 at 3 ("Shortly after my hire, I began receiving unwanted attention from Roy Berger, part-owner and Chief Executive Officer of Medjet.")). Medjet received a copy of Ms. Murdoch's initial EEOC charge on or about August 22, 2015.[17] AAF 7.5.

On September 11, 2015, Ms. Murdoch filed her second EEOC charge (No. 420-2015-02871) alleging retaliatory discharge on the basis of her recent administrative sexual-harassment complaint made against Medjet and her firing (as decided by Mr. Berger on August 27, 2015, and communicated to Ms. Murdoch on August 28, 2015–less than 1 week later). (Doc. 1-3 at 2).[18]

---

[16]  All page references to Doc. 1-1 correspond with the Court's CM/ECF numbering system.

[17]  According to the calendar, August 22, 2015, is a Saturday.

[18]  All page references to Doc. 1-3 correspond with the Court's CM/ECF numbering system.

### H. Sexual Harassment Allegations Made by Other Medjet Employees

On December 23, 2014, Cathy Rollins ("Ms. Rollins"), Medjet's former Director of Partner Development, made a verbal complaint to Medjet's Chief Operating Officer, John Gobbels ("Mr. Gobbels") that she believed Mr. Berger had engaged in inappropriate sexual behavior toward her. AF No. 23.1; ADF 4.2. Accordingly to Ms. Rollins, Mr. Berger made numerous attempts to flirt with her and coerce her. ADF 4.3.

Mr. Berger asked Ms. Rollins if he were "kissable", and pinned her against her desk. ADF 4.4. He made further statements to Ms. Rollins that his wife was out of town and he was lonely. ADF 4.5. Mr. Berger also allegedly put a newspaper in Ms. Rollins's lap and then patted it, and has put his hands on her shoulder blades asking her if that made her feel uncomfortable. ADF 4.6 Mr. Berger further commented about Ms. Rollins's sexuality and her appearance. ADF 4.7.

When Ms. Rollins first spoke to Mr. Gobbels about Mr. Berger's unwanted behavior and inappropriate touching, he told her "that nothing could be done unless [she] filed a formal complaint . . . ." (Doc. 26-6 at 2).[19] Subsequently, Ms. Rollins

---

[19]  All page references to Doc. 26-6 correspond with the Court's CM/ECF numbering system.

completed a "formal"[20] filing. *Id.* Mr. Gobbels then reported Ms. Rollins's complaint to corporate counsel and a member of the board of directors. AF No. 23.2. A meeting was held and, although Mr. Berger denied any inappropriate conduct, he was counseled about his behavior toward Ms. Rollins and other female employees. AF No. 23.3. Mr. Gobbels advised Ms. Rollins that her complaint had been reported and that she should not expect to have any other problems. AF No. 23.4. Within two weeks of being admonished by corporate counsel and advised to cease engaging in any actions toward Ms. Rollins, Ms. Rollins was informed that Mr. Berger was rubbing the leg of another female employee under the table at a staff meeting. ADF 4.8; ADF 4.9.

In February of 2015, Mr. Gobbels initiated another meeting with Ms. Rollins to determine if there were any continued problems and Ms. Rollins confirmed that the alleged harassment had stopped and she was satisfied with the result. AF No. 23.5. Ms. Rollins made no further complaint of harassment to Medjet. AF No. 23.6.

Former MedJet employee Julie Pyron ("Ms. Pyron") also experienced numerous comments and actions from Mr. Berger which she felt were sexually

---

[20] Neither side explains what the material differences are between a formal sexual harassment complaint made at Medjet versus an informal one. An apparent difference that this Court is able to glean from the record is that a formal complaint is one made in writing while an informal one is one made orally.

harassing in nature. ADF 5.1. Mr. Berger inquired about her sex life, frequently commented on her clothing, and even once asked her whether or not she was wearing any panties. ADF 5.2. Mr. Berger rubbed Ms. Pyron's shoulders, grabbed her hand, and, on one occasion, in a staff meeting, put his hand on her leg under the table. ADF 5.3. On yet another occasion, Mr. Pyron leaned over or knelt on the floor to stock a mini refrigerator during which time Mr. Berger made comments such as "I like you in that position." ADF 5.4.

Ms. Kerr also experienced conduct from Mr. Berger that she found to be inappropriate. ADF 6.1. Ms. Kerr on one occasion received pats on her bottom from Mr. Berger. ADF 6.2. On another occasion, Mr. Berger sent Ms. Kerr an email stating, "You are the only lady I'm interested in watching." ADF 6.3. Mr. Berger rubbed Ms. Kerr's shoulders on numerous occasions. ADF 6.4. In fact, it became an "every morning kind of thing." *Id.* Ms. Kerr also witnessed an instance when Mr. Berger put his hand on Ms. Murdoch's knee in a staff meeting. ADF 6.5.

MedJet's current Marketing Manager, Jennifer Tidmore ("Ms. Tidmore") testified that she experienced similar inappropriate conduct from Mr. Berger. ADF 7.1. On one occasion, while Ms. Tidmore was bent over, Mr. Berger commented that he liked the view. ADF 7.2.

Another time, while on a business trip, Mr. Berger handed Ms. Tidmore a room

key to her hotel room and stated, "all the times that he had thought about or daydreamed about giving me his hotel room key, this isn't what he had in mind." ADF 7.3. Ms. Tidmore further testified about an instance when she suggested in an email that, due to Mr. Berger' s height, he may require a large yoga mat, and he replied "are you saying on the record size matters?" ADF 7.4.

Ms. Tidmore also experienced the unwanted rubbing of shoulders by Mr. Berger. ADF 7.5. Finally, Ms. Tidmore recalls that one time her shirt rode up exposing the skin on the small of her back and Mr. Berger ran his finger across that part of her body. ADF 7.5.

Ms. Tidmore testified that she reported Mr. Berger's alleged inappropriate conduct to her immediate supervisor, Will McKee ("Mr. McKee"). (Doc. 26-4 at 7 at 22).[21] Ms. Tidmore made a report to Mr. McKee about the yoga-email incident in January 2014. (*Id.* at 23). When she made this report to Mr. McKee, Ms. Tidmore testified that "[h]e was aware already of the previous things." (*Id.* at 22).

 As Ms. Tidmore further explained her exchange with Mr. McKee about Mr. Berger's conduct:

> He told me that as my supervisor, he was supposed to report it to his supervisor. But as my friend of 15 years, he would do what I wanted

---

[21]  All initial page references to Doc. 26-4 correspond with the Court's CM/ECF numbering system.

him to do. <u>And so I told him that I wanted to just leave it for now</u>.

*Id.* (emphasis added).

## IV. ANALYSIS

### A. Ms. Murdoch's Uncontested Outrage Claim

In opposing the Motion, Ms. Murdoch has "concede[d] that the conduct alleged will not support a claim for outrage under Alabama law." (Doc. 25 at 24 n.3). Accordingly, the Motion is **GRANTED** as to Count Six. Ms. Murdoch contests the dismissal of all remaining federal and state-law claims. The Court begins by evaluating Ms. Murdoch's Title VII claims.

### B. Ms. Murdoch's Sexual Harassment Claim (Count One)

#### 1. Underlying Principles Governing Sexual Harassment

Title VII provides that an employer "shall not discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, <u>sex</u>, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis added). Title VII has been interpreted to specifically allow claims for sexual harassment to rest upon the theory of an abusive work environment. *See, e.g., Burlington Indust. v. Ellerth*, 524 U.S. 742, 765 (1998). Ms. Murdoch asserts a claim for sexual harassment in violation of Title VII due to the

hostile working environment allegedly created by the actions of Mr. Berger.[22]

A Title VII sexual harassment claim that is premised upon a hostile working environment created by a supervisor requires *prima facie* proof from a plaintiff:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Henson*, 682 F.2d at 903-05.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).[23]

### 2. Summary Judgement Is Appropriate on Ms. Murdoch's Sexual Harassment Claim.

Medjet's Motion asserts three reasons why this Court should grant summary judgment on Ms. Murdoch's sexual harassment claim. First, Medjet contends that "[m]ost, if not all, of the conduct complained of by [Ms.] Murdoch is objectively not sexual." (Doc. 20 at 19 (emphasis omitted)).[24] Second, "[m]ost, if not all, of the

---

[22] Ms. Murdoch does not assert a claim for sexual harassment involving a tangible job action.

[23] Concerning the fifth element, "an employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee—subject to an affirmative defense." *Mendoza*, 195 F.3d at 1245 n.4 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Ellerth*, 524 U.S. at 765). Medjet does not raise a fifth-element challenge to Ms. Murdoch's sexual harassment claim.

[24] All page references to Doc. 20 correspond with the Court's CM/ECF numbering system.

alleged conduct from [Mr.] Berger was welcomed." (Doc. 20 at 20 (emphasis omitted)). Third, "[t]here was no severe or pervasive harassment." (Doc. 20 at 22 (emphasis omitted)).

In attempting to make its initial point (which is tied to *Mendoza*'s second prong), Medjet relies upon the Eleventh Circuit's decision in *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), *as stated in Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008), and *Gupta*'s internal references to *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) and *Mendoza*. (Doc. 20 at 19-20). The Court is unconvinced by Medjet's *Gupta*-based position that complimenting someone about her looks or making similar comments about a person's appearance can never meet *Mendoza*'s second prong of "unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature." (Doc. 20 at 19).

Importantly, *Gupta* does not hold that compliments about a person's attractiveness or beauty are never objectively sexual under the second prong. Instead, the *Gupta* court excluded as non-sexual in nature the plaintiff's complaint that "Rhodd told her to steer clear of certain faculty members because they were evil and racist." 212 F.3d at 583. The court similarly found that "assist[ing] [the plaintiff] with

the move to Fort Lauderdale by helping her find a place to live and to find inexpensive furniture" was non-sexual in nature. *Id.* Finally, *Gupta* rejected the plaintiff's "critici[sm]" of "telling her to come and see him if there was anything he could do for her" as exemplifying <u>sexually</u> harassing behavior." *Id.* (emphasis added).

The *Gupta* court <u>then</u> addressed the <u>remaining</u> "comments and behavior [including complimenting the plaintiff about "looking very beautiful"] . . . that [were], or arguably could be, considered to be of a sexual or gender-related nature." 212 F.3d at 584. Further, although the Eleventh Circuit expressed doubt over whether the remaining evidence before it was sufficiently sexual, the court never directly decided that issue, and opted "for present purposes [to] assume it to be." *Id*; *cf. also id.* ("<u>It is debatable whether such a compliment is sexual in nature, but assuming that it is</u>, we do not believe that a reasonable person would deem it to be offensive.") (emphasis added).

The *Gupta* court then proceeded to analyze the plaintiff's sexually-related, or at least arguably-sexually-related, allegations (including the compliment) to determine if they met *Mendoza*'s severe or pervasive prong–the fourth prong. With respect to the compliment more particularly, the Eleventh Circuit "d[id] not believe that a reasonable person would deem it to be offensive." 212 F.3d at 584. Therefore, *Gupta* does not substantiate Medjet's challenge to Ms. Murdoch's sexual harassment

allegations under the sexual component of *Mendoza*'s second prong. Further, Medjet offers no other authorities to support its contention that the conduct was non-sexual and, therefore, not cognizable under Title VII. Accordingly, that part of Defendants' Motion is **DENIED**.

Medjet's second contention also applies to *Mendoza*'s second prong. More specifically, Medjet maintains that, with respect to most of her allegations, Ms. Murdoch cannot show unwelcomeness. As the Supreme Court has explained the meaning of this term:

> The gravamen of any sexual harassment claim is that the alleged sexual advances were "unwelcome." 29 C.F.R. § 1604.11(a) (1985). While the question whether particular conduct was indeed unwelcome presents difficult problems of proof and <u>turns largely on credibility determinations committed to the trier of fact</u>, the District Court in this case erroneously focused on the "voluntariness" of respondent's participation in the claimed sexual episodes. <u>The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome</u>, not whether her actual participation in sexual intercourse was voluntary.

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (emphasis added). The Eleventh Circuit has similarly stated that "[i]n order to constitute harassment, this conduct must be unwelcome in the sense that <u>the employee did not solicit or incite it</u>, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982) (emphasis

added) (citing collection of authorities). Thus, the presence of unwelcomeness is contingent upon Ms. Murdoch's interactions with Mr. Berger and not the comparable experiences that other Medjet employees claim to have had with him. (*Cf.* Doc. 25 at 13 (suggesting that Mr. Berger's treatment of Ms. Murdoch was "objectively offensive" in light of testimony from other Medjet employees "who had been subjected to [and were offended by] the same or similar conduct from [Mr. Berger]")). Additionally, Ms. Murdoch does not maintain that she had any knowledge of these other situations during the period in which she is claiming harassment. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014) ("The totality of a plaintiff's workplace circumstances <u>does not include other employees' experiences of which the plaintiff is unaware</u>.") (emphasis added).

In response to the issue of unwelcomeness, Ms. Murdoch states:

> Defendants argue that [Mr.] Berger's conduct toward [Ms. Murdoch] was welcomed because [she] . . . did not verbally object to the conduct and comments made by the President and CEO of the corporation during the first few months of her employment.

> [Ms. Murdoch] did, however, testify that on those occasions when [Mr.] Berger hugged her, she did not hug him back. Further, she testified that she indicated to [Mr.] Berger that she was uncomfortable with the prying questions he was asking about her personal life. [Mr.] Berger testified that, while [Ms. Murdoch] was out following surgery, [she] deflected [Mr.] Berger's offer to come visit her at her house.

(Doc. 25 at 13-14 (citations omitted)). Thus, Ms. Murdoch concedes that, with the

exceptions of Mr. Berger's full-body hugs, his prying questions, and an offer to come visit her at her house post-surgery, she lacks conduct–on her part–indicating that Mr. Berger's alleged harassing comments and actions involving her were unwelcomed.

Further, the totality of the record confirms why Ms. Murdoch's limited opposition to the unwelcomeness factor of *Mendoza*'s second prong makes sense. More specifically, for the approximate 6 to 7-month period in which she claims that Mr. Berger sexually harassed her, Ms. Murdoch undisputedly engaged in her own pattern of inciting and/or engaging in flirtatious conduct toward him. Such examples include referring to Mr. Berger as "Dear"; adding smiley faces to several messages that she sent to him; grabbing his hand in the car and telling him words to the effect of, "I just want to thank you for being so nice to me and caring about me"; complimenting him on his nice tan and his kindness and generosity as a boss; lamenting that things in the office are "just so-so" when he is not there; and informing him (via text) after one of their lunches that she would "pretend" lunch was his idea rather than Ms. Roy's and joking with him that "I have an imagination and that's all I'm saying!" These undisputed facts reflect a mutual welcomeness between Ms. Murdoch and Mr. Berger (for most of the challenged conduct) rather than actionable unilateral unwelcoming behavior by Mr. Berger.

Given this record, no reasonable jury could conclude that Ms. Murdoch found

Mr. Berger's conduct from the start of her employment until March 2015 (other than arguably those categories specifically excepted by her above) to be undesirable or offensive in the Title VII sense.[25] Accordingly, the lack of unwelcomeness portion of Medjet's Motion is **GRANTED IN PART**.

Now the Court turns to Medjet's third challenge to Ms. Murdoch's Title VII sexual harassment claim–the absence of severe or pervasive conduct. More specifically, Medjet maintains that even if "some of Mr. Berger's actions were unwelcome and based on sex," such conduct falls short of being severe or pervasive to alter the terms or conditions of Ms. Murdoch's employment. (Doc. 20 at 22).

In light of the ruling immediately above, there are three categories of conduct remaining that Ms. Murdoch relies upon to satisfy the fourth *Mendoza* prong: Mr. Berger's 7 to 10 unwanted full-body hugs, his prying questions, and his offer to come visit her at her house post-surgery. With respect to evaluating the fourth element of a hostile work environment claim:

---

[25] The Court acknowledges that Ms. Murdoch complains that after Mr. Berger learned about her engagement in March 2015, "he became non-communicative, would not talk to [her], [was] rude, [was] obnoxious" and her entire work environment changed. (Doc. 21-3 at 49 at 189-190). Ms. Murdoch may have been hurt or offended by Mr. Berger's change in attitude toward and treatment of her in March 2015. (*Cf.* Doc. 25 at 13 (citing to Ms. Murdoch's deposition and indicating that Mr. Berger became "rude, hostile and uncooperative" to Ms. Murdoch after he was aware of her engagement)). However, that type of arguably offensive but non-sexual treatment is distinct from the type of sexually offensive behavior that will support a Title VII hostile environment claim.

[T]he Supreme Court and [the Eleventh Circuit] have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. *Id.*; *see Harris*, 510 U.S. at 23, 114 S. Ct. 367; *Henson*, 682 F.2d at 904; *Faragher*, 118 S. Ct. at 2283 (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367, and explaining that "[w]e directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances'").

*Mendoza*, 195 F.3d at 1246.

As recognized by the Eleventh Circuit, the severe or pervasive prong "is the element that <u>tests the mettle of most sexual harassment claims</u>." *Gupta*, 212 F.3d at 583 (emphasis added). "Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere 'general civility code.'" 212 F.3d at 583 (quoting *Faragher*, 524 U.S. at 788).

"This requirement is regarded as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or <u>intersexual flirtation</u>—for discriminatory conditions of

employment." 212 F.3d at 583 (emphasis added) (internal quotation marks omitted) (quoting *Oncale*, 523 U.S. at 81). As a result, "a plaintiff must establish not only that she subjectively perceived the environment as hostile and abusive, but also that <u>a reasonable person would perceive the environment to be hostile and abusive</u>." *Gupta*, 212 F.3d at 583 (emphasis added) (citing *Mendoza*, 195 F.3d at 1246). As an initial matter, the Court points out that Ms. Murdoch has made no attempt to analyze her sexual harassment allegations in the context of the foregoing framework. Regardless, for purposes of the fourth-prong analysis, the Court assumes without deciding that Ms. Murdoch can satisfy the subjective component and proceeds with determining whether a "reasonable person would perceive the environment to be hostile and abusive." *Id.*

The Court first turns to the 7 to 10 unwanted hugs from Mr. Berger that Ms. Murdoch endured over the span of 6 to 7 months. While Ms. Murdoch describes these encounters as full-body hugs, she does not contend that Mr. Berger's hugs ever went beyond that into rubbing, groping, or some other more sexually-aggressive touching. She also does not assert that Mr. Berger said anything of a sexual nature when he hugged her. Thus, there is no evidence from which a reasonable jury could conclude that these (at most) twice-monthly hugs were objectively severe, physically-threatening, or humiliating.

Ms. Murdoch also has not offered any evidence to show how these infrequent hugs caused her to miss work or otherwise interfered with her job performance. *See Meritor*, 477 U.S. at 65 ("[T]he Guidelines provide that such sexual misconduct constitutes prohibited 'sexual harassment,' . . . , where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment'" (emphasis added) (quoting 29 C.F.R. § 1604.11(a))); *cf. Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp.2d 1314, 1326 n.21 (M.D. Fla. 2002) (finding insufficient proof of interference with work when the plaintiff failed to show that his "pain or sick feelings altered his work performance in any overt way or prevented him from attending work"). Thus, Mr. Berger's undesired hugs do not objectively meet the severe or pervasive prong.

As for Mr. Berger's prying questions about her personal matters including her dating life and marriages, Ms. Murdoch maintains that these occurred over lunch and that she informed Mr. Berger that such questions made her feel uncomfortable. Unlike the unwanted hugs, the summary judgment record does not reflect how many dating or marriage-related questions Mr. Berger asked Ms. Murdoch. However, because these inquiries took place at lunch and there were no more than 3 such lunches, then at most Mr. Berger asked Ms. Murdoch a series of personal questions that made her

uncomfortable over 3 lunches during the 6 to 7 months of his alleged harassing behavior.

To the extent that Mr. Berger's questions were frequent, the other factors are objectively lacking. A boss's questions to a subordinate about who she is dating and how many times she has been married may be perceived as rude or uncivilized by some. However, they do not–without more–objectively translate into severe or pervasive conduct or create a hostile work environment. Importantly, the record lacks any indication that Mr. Berger probed Ms. Murdoch about more provocative areas of her personal life. For example, Mr. Berger never asked her how often she had sex or whether she had ever considered having an affair when she was married. He also never asked her to go on a date with him or to have sex. Ms. Murdoch additionally does not claim that Mr. Berger ever touched her inappropriately during these lunches.

Further, Ms. Murdoch has not shown how these questions taking place at lunch between just the two of them were physically-threatening, humiliating, or interfering with her ability to do her job. *Cf. Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002) ("The very nature of the coworkers' utterances, coupled with the fact that they were directed at Miller and were sometimes used in the course of reprimanding him in front of others, establishes this factor [of humiliating conduct].") (emphasis added). Thus, Ms. Murdoch lacks sufficient evidence for a reasonable jury

to conclude that the personal questions from Mr. Berger were objectively severe or pervasive.

Finally, Ms. Murdoch relies upon her successful "resistance" to Mr. Berger's offer to come visit her at home post-surgery to satisfy *Mendoza*'s fourth prong. Importantly, Ms. Murdoch does not contend that Mr. Berger's offer to see her was coupled with any "sexually explicit remarks or innuendos." *Gupta*, 212 F.3d 584-85. Ms. Murdoch also does not allege that Mr. Berger expressed a willingness to come to her home on other occasions. *Cf. Gupta*, 212 F.3d at 585 ("Neither the content of Rhodd's remarks nor the number of the phone calls suggests obsessive or stalker-like behavior by Rhodd."). Especially in the absence of Mr. Berger's actually coming to her house, no reasonable juror could conclude that such an unfulfilled offer objectively meets any of the severe or pervasive factors. Instead, Mr. Berger's post-surgery offer was an isolated incident that did not ever materialize, much less result in any serious physical or emotional consequences for Ms. Murdoch. *See Faragher*, 524 U.S. at 788 (pointing out that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'"). Also, the situation had no conceivable impact on Ms. Murdoch's job performance as she was on medical leave when it occurred.

Thus, no category of claimed unwanted conduct meets *Mendoza*'s fourth prong.

Further, considering the totality of circumstances, no reasonable person would perceive Ms. Murdoch's environment to be hostile or abusive in a Title VII cognizable manner. In sum, "[t]he alleged harassment in this case exemplifies 'the ordinary tribulations of the workplace,' *Faragher*, 524 U.S. at 788, which the Supreme Court and [the Eleventh Circuit] have held do not constitute actionable sexual harassment." *Gupta*, 212 F.3d at 586. Consequently, the Motion is **GRANTED** as to Count One.[26]

### C.    Ms. Murdoch's Retaliation Claim (Count Two)

### 1.    Underlying Principles Governing Retaliation

"Retaliation against an employee who engages in statutorily protected activity is barred under . . . Title VII . . . ." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257-58 (11th Cir. 2012). The Supreme Court originally established the basic allocation of burdens and order of proof in a Title VII disparate treatment case based

---

[26]  Even when considering the full scope of Ms. Murdoch's allegations against Mr. Berger, her harassment claim still does not meet *Mendoza*'s severe-or-pervasive framework. First, given Ms. Murdoch's welcoming response to many of Mr. Berger's actions and the absence of any evidence demonstrating that his conduct had a negative vocational impact on her, she cannot substantiate the subjective component of that prong. Second, while the quantity of allegations to consider is certainly greater, the overall quality of them still do not present a triable fourth-prong issue from an objective viewpoint. Certainly some might question Mr. Berger's conduct as CEO or even vehemently disagree with it as uncivilized and unprofessional behavior. Nonetheless, no reasonable person would conclude that Ms. Murdoch received treatment from Mr. Berger that reached the triable level of being objectively severe, physically threatening, humiliating, and/or that prevented her from doing her job.

upon circumstantial (as opposed to direct)[27] evidence in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* model, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of retaliation. Within the Eleventh Circuit:

> A plaintiff establishes a *prima facie* case of retaliation by showing that: (1) she "engaged in statutorily protected activity"; (2) she "suffered a materially adverse action"; and (3) "there was a causal connection between the protected activity and the adverse action." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010); *accord Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008).

*Gate Gourmet*, 683 F.3d at 1258.[28]

### First Element–Protected Activity

Concerning the first element, statutorily protected activity triggering coverage under Title VII's antiretaliation provision comes in two forms–opposition-based or

---

[27] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate [or retaliate] . . . constitute direct evidence of discrimination [or retaliation]." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (citing *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 610-11 (11th Cir. 1987)). In opposing summary judgment, Ms. Murdoch does not offer any direct evidence of retaliation; rather she only contends that a circumstantial case of retaliation exists. (*See* Doc. 25 at 17-20 (arguing that Medjet's explanation for her firing is pretextual)).

[28] *Davis* (which *Gate Gourmet* relies upon) was abrogated on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), as stated in *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294 (11th Cir. 2018).

participation-based conduct.[29] More specifically, "[a]n employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) (on petition for rehearing) (citing 42 U.S.C. § 2000e-(3)(a)).

Concerning the opposition clause more specifically:

[A] plaintiff can establish a *prima facie* case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. <u>A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.</u>

A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order

---

[29] Ms. Murdoch's case contains both types of protected activity–a letter sent to Medjet from her lawyer opposing sexual harassment in the workplace and attaching a draft EEOC charge (opposition clause) and her formal filing of an EEOC charge concerning sexual harassment (participation clause).

to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation o[r] informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a *prima facie* case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied*, 455 U.S. 1000, 102 S. Ct. 1630, 71 L. Ed. 2d 866 (1982).

*Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis by underlining added) (alteration added to correctly quote from *Sias*) (footnote omitted).

Regarding the broad coverage afforded under Title VII's participation clause, the Eleventh Circuit has explained:

Congress chose to protect employees who "participate[ ] in *any* manner" in an EEOC investigation. 42 U.S.C. § 2000e-3(a) (emphasis added). The words "participate in any manner" express Congress' intent to confer "exceptionally broad protection" upon employees covered by Title VII. *See Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1006 n.18 (5th Cir. 1969). As we pointed out in *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997), "the adjective 'any' is not ambiguous. . . . [It] has an expansive meaning, that is, one or some indiscriminately of whatever kind. . . . [A]ny means all." (internal quotations and citations omitted). Because participation in an employer's investigation conducted in response to a notice of charge of discrimination is a form of participation, indirect as it is, in an EEOC investigation, such participation is sufficient to bring the employee within the protection of the participation clause.

*Clover*, 176 F.3d at 1353.

## Second Element–Materially Adverse Action

As defined by the United States Supreme Court in *Burlington Northern*, a materially adverse action is one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57; *see also Gate Gourmet*, 683 F.3d. at 1259 (same); *id.* at 1260 (finding material adversity in an employer's decision to deny a light-duty position to the plaintiff after she filed and refused to settle an EEOC charge). A materially adverse action can arise within or without the workplace. *See Burlington Northern*, 548 U.S. at 57 ("[T]he antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.").

## Third Element–Causal Connection

The third element requires proof of a causal connection between the plaintiff's protected activity and the materially adverse action. As a divided Supreme Court held, Title VII retaliation requires proof of customary but-for causation, rather than the less burdensome motivating-factor standard applicable to Title VII discrimination claims:[30]

---

[30] Ms. Murdoch does not assert any Title VII disparate treatment claims based on

Based on these textual and structural indications, the Court now concludes as follows: Title VII retaliation claims must be proved according to <u>traditional principles of but-for causation</u>, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (emphasis added); *cf. id.* at 343 ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act."); *id.* ("It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

"At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citations omitted).[31]

## Post-*Prima Facie* Case Considerations

Once a plaintiff establishes a *prima facie* case of retaliation, the burden of

---

discrimination.

[31] Mr. Berger concedes that he was aware of Ms. Murdoch's protected activity when he made the decision to fire her.

production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. If the defendant carries its burden of production, "[t]o survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination [or retaliation]." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)); *see also Reeves*, 530 U.S. at 148 ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated [or retaliated].").

A plaintiff can prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels*, 408 F.3d at 771 (internal quotation marks omitted) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)).

### 2. Ms. Murdoch's Retaliation Claim Is Triable.

Medjet concedes that Ms. Murdoch meets the first two *prima facie* elements

of a retaliation claim. (Doc. 20 at 24). Medjet's *prima facie* challenge is therefore limited to the causal-connection element. *Id.*

To establish a causal connection, Ms. Murdoch relies on the timing between Mr. Berger's decision to fire her made on August 27, 2015, and Medjet's receipt of her EEOC charge less than a week before that date. As the Supreme Court has instructed, in order to rely solely upon "temporal proximity between an employer's knowledge of protected activity and a[] [materially] adverse . . . action as sufficient evidence of causality to establish a *prima facie* case [of retaliation] . . . [the knowledge and materially adverse action] must be 'very close[.]'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). *Breeden* further confirms that evidence of a 3-month (or longer) lapse in time (without more) is legally inadequate to show a causal connection. *See id.* (citing with approval authorities finding that a gap of 3 or 4 months is insufficient as a matter of law).

Here, Medjet does not contest the closeness of the timing between its notice of Ms. Murdoch's filing of her EEOC charge and her dismissal. Instead, it argues that "the timing of the charge filing is of no consequence in this case." (Doc. 20 at 24). Medjet points to the protected activity of the letter sent by Ms. Murdoch's attorney on June 25, 2015, and argues that "Medjet and [Mr.] Berger had long since been

aware of [Ms.] Murdoch's protected activity before the charge was filed." *Id.* As

Medjet maintains, if Defendants "were motivated by retaliation, then they wouldn't

have waited two months after gaining knowledge of [Ms.] Murdoch's protected

activity to terminate her employment." (*Id.* at 24-25). Medjet further urges, citing to

*Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007), that the Eleventh

Circuit has held that a 2-month gap "is not a sufficiently short time frame to create a

causal connection based solely on temporal proximity." (*Id.* at 25).

Medjet offers no authority in support of its first causal-connection argument.

Without more development, the Court is not inclined to conclude that Mr. Berger's

undisputed notice of two Title VII protected acts both occurring less than 2 months

before (and the second one occurring within 1 week of) Ms. Murdoch's discharge are

inadequate to show temporal proximity. The Court is particularly dubious about

Mejet's position here where the alleged harasser and the ultimate decisionmaker are

the same person (which means that Ms. Murdoch is <u>not</u> relying <u>solely</u> upon temporal

proximity to demonstrate causation for her retaliation claim).

While Medjet purports to offer authority in support of its second point, it

misstates the scope of *Thomas*'s holding–<u>it is a 3-month gap case</u> and <u>not</u> a 2-month

one. *See Thomas*, 506 F.3d at 1364 ("Thomas failed to present evidence from which

a reasonable jury could find any causal connection between her April 2005

complaint(s) of sexual harassment and the termination of her employment three (3) months later in July 2005.") (emphasis added). Consequently, *Thomas* does not mean Ms. Murdoch's pre-EEOC letter to Medjet is too old to be causally related to her discharge as a matter of law. Therefore, the Court is unconvinced by Medjet's two-part causal-connection challenge and, to the contrary, finds that Ms. Murdoch has provided sufficient evidence to show a *prima facie* case of Title VII retaliation.

Medjet–through Mr. Berger–has articulated a legitimate, non-discriminatory reason for discharging Ms. Murdoch–her August client-crediting error and that mistake's consistency with Ms. Murdoch's prior performance problems as reported to him by Ms. Roy. Nonetheless, the Court finds that Ms. Murdoch has adduced sufficient evidence of pretext–there is enough evidence from which a reasonable trier of fact could disbelieve Mr. Berger's explanation and conclude, instead, that Ms. Murdoch's protected activity was the but-for reason resulting in her discharge. *See MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (recognizing that denying summary judgment is appropriate when the record contains "evidence of such quality and weight that reasonable and fair[-]minded men in the exercise of impartial judgment might reach different conclusions" (alteration added to correctly reflect quoted source) (internal quotation marks omitted) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1998))).

More specifically, the record lacks any confirmation of a written disciplinary policy. The absence of a written framework means more discretion for the employer when making job-related decisions. At the same time, however, that possibility also "introduces subjectivity into employment decisions." *Morrison*, 763 F.2d at 1374; *cf. id.* ("We have always looked upon this [, *i.e.*, subjectivity] with increased scrutiny ….."). As discussed in the causal-connection section, the potential for subjectivity in meting out discipline is particularly important in this instance, given Mr. Berger's dual roles as the alleged harasser named in Ms. Murdoch's underlying EEOC charge and the Medjet employee who was responsible for the decision to discharge her.

Further, Ms. Kerr testified that an employee would normally be suspended for 2 days without pay.[32] Ms. Kerr also recalled that she was suspended for 2 days when

---

[32] In a footnote in their reply, Defendants indicate that Ms. Kerr's testimony regarding Medjet's disciplinary policy is "[in]sufficient to cast doubt on Medjet's asserted reason for [Ms.] Murdoch's termination." (Doc. 28 at 9 n.4). Defendants' failure to present this issue in a motion to strike prevents Ms. Murdoch from having an opportunity to respond. Moreover, "[a]rguments raised for the first time in a reply brief are not properly before the reviewing court." *United States v. Benz*, 740 F.2d 903, 916 (11th Cir. 1984) (citing *Knighten v. Commissioner of Internal Revenue*, 702 F.2d 59, 60 (5th Cir. 1983)).

Regardless, in the absence of any supporting legal analysis, Defendants' point is undeveloped and unpersuasive, especially since Ms. Kerr worked directly for Mr. Berger–Medjet's undisputed hiring and firing authority–and, in that role, she would have had some understanding of the ordinary practice even though she was not the decisionmaker. Additionally, the record lacks any contradiction (via deposition or declaration) of Ms. Kerr's testimony that a suspension without pay is the discipline usually imposed at Medjet. *Cf. King v. Piggly Wiggly Alabama Distribution Co.*, 929 F. Supp. 2d 1215, 1222 (N.D. Ala. 2013) ("In its reply, [the employer] has not contested [the plaintiff]'s facts regarding its customary practice of videotaping the yard.") (emphasis added). In fact, Mr. Berger testified that he disciplined Ms.

she was disciplined for mishandling a customer-related issue. (Doc. 26-5 at 10 at 34).

Ms. Kerr also indicated that she would not consider Ms. Murdoch's August customer-credit mistake to be a firable offense. (*Id.* at 36).

The Court acknowledges that Medjet states in its reply brief that Ms. Roy "testified that termination following a prior warning was Medjet's normal disciplinary procedure." (Doc. 28 at 9). However, this fact was not included in Medjet's statement of facts and no underlying evidence from either her deposition or declaration is cited to support it. "Statements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).[33] Consequently, the Court cannot accept this unsubstantiated statement for summary judgment purposes.

Regardless, Mr. Berger similarly indicated in his deposition (like Ms. Kerr) that he followed the suspension procedure when he recently disciplined Ms. Roy. Mr. Berger's treatment of Ms. Murdoch was arguably harsher. Rather than suspending her without pay, Mr. Berger fired her within a week of receiving notice that she had formally filed an EEOC charge accusing him of sexual harassment. He also made the

---

Roy in that exact manner recently. Further, neither declaration offered by Ms. Roy or Mr. Berger addresses this issue from an evidentiary standpoint despite's Medjet's awareness of Ms. Kerr's testimony before Defendants filed their Motion.

[33] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

decision to fire Ms. Murdoch without involving a second person and in contravention of Ms. Roy's testimony that disciplinary decisions usually involved two people.

The Eleventh Circuit has acknowledged that "[d]epartures from normal procedures may be suggestive of discrimination." *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985); *cf. id.* (explaining how "circumvention of established procedures" for white employees while withholding such exercise of discretion for the black plaintiff meets showing of pretext); *cf. also E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003) ("Kohler's <u>lax enforcement of company policy and disciplinary procedures</u> provided additional evidence from which a jury could have found retaliatory motive.") (emphasis added).[34]

Ms. Murdoch also points to Ms. Lowery as a potential comparator. Concerning the circumstances surrounding Ms. Lowery's separation from Medjet, Mr. Berger testified:

> As a result of an internal audit, we found that <u>she had actually falsified a revenue document</u>, actually a revenue document, in the State of Michigan, and she had no reasonable explanation of why she did that.
> . . .
> We met as a four-member management committee. We discussed the situation. I was not nearly as adamant on her termination as two others on the committee were.

---

[34] Unlike Ms. Murdoch, the *Kohler* plaintiff had several suitable comparator witnesses. 335 F.3d at 775-76.

> We decided to terminate her, but the mistake that we made on both sides is this was December, and we wanted to try to give her the benefits of the holidays to keep working, and frankly give us the benefit of year-end results that she could do for us. So I think we agreed the termination, though it did happen earlier, the second week in November, <u>it would actually go into effect at the end of January</u>.

(Doc. 21-2 at 5 at 14-15 (emphasis added)). Thus, the effective date for Ms. Lowery's termination was extended for 2 months (through the holiday season) even though her firable offense was an admitted <u>falsification</u> of a revenue document.

Medjet contends that Ms. Murdoch's retaliation claim fails at the pretext stage due to her absence of suitable comparator evidence. Oftentimes sufficient pretext is shown by comparing how a supervisor has treated similarly situated subordinates (*i.e.*, who violated the same rule or policy, but who did not oppose unlawful employment practices or file an EEOC charge) more favorably than the plaintiff. *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999) ("[T]he 'work rule' defense is arguably pretextual when a plaintiff submits evidence . . . that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated."). Medjet urges that Ms. Murdoch's identification of Ms. Kerr, Ms. Roy, and Ms. Lowery (who received more favorable disciplinary treatment than she, *i.e.*, 2 suspensions and 1 deferred termination for falsifying a revenue document versus no suspension and, instead, an

immediate termination for poor performance) is insufficient because she has not established that "the employees are similarly situated 'in all relevant respects.'" (Doc. 28 at 7 (emphasis omitted) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)).

The Court agrees with Medjet that Ms. Murdoch's comparator evidence is not without flaws. Nonetheless, "[Ms. Murdoch]'s failure to identify a comparator does not end the analysis of her termination claim . . . ." *Id.* at 1092. Instead, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination [or retaliation] is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis omitted) (citing *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989)); *see also Rioux v. City of Atlanta*, 520 F.3d 1269, 1281-82 (11th Cir. 2008) (finding that plaintiff still satisfied the pretext burden, despite the absence of any valid comparator evidence); *King*, 929 F. Supp. 2d at 1224 ("[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory [or retaliatory] intent." (citing *Holifield*, 115 F.3d at 1562)).

Ms. Murdoch has shown that her performance-related issues as documented by Ms. Roy and reported to Mr. Berger did not reach the level of a firable offense (under

Medjet's unwritten and subjective disciplinary policy) in Mr. Berger's view until

shortly after Ms. Murdoch had filed her EEOC charge accusing him of sexual

harassment. Indeed, as Ms. Roy's declaration set outs, she recommended twice to Mr.

Berger in 2015 (once in April, once in May, and both before Ms. Murdoch had

engaged in any protective activity) that he fire Ms. Murdoch and, each time, he

declined to do so. (Doc. 21-4 at 3 ¶ 5). It was only after Ms. Murdoch engaged in

protected activity accusing Mr. Berger of sexual harassment under Title VII that her

performance became such a problem for him that he disregarded Medjet's normal 2-

day suspension procedure (which, accepting Ms. Kerr's uncontroverted testimony,

is Medjet's usual protocol) and fired her. As this Court has previously explained in

another retaliation case in which comparator evidence was entirely non-existent, "this

peculiar selective-enforcement evidence straightforwardly discredits or makes

implausible [Medjet]'s stated reason for discharging [Ms. Murdoch]." *Jones v. City

of Heflin*, 207 F. Supp. 3d 1255, 1278 (N.D. Ala. 2016); *cf. id.* at 1277 ("Mr. Jones's

evidence of pretext includes his testimony that Captain Benefield was aware of and

did not have any problems with Mr. Jones's relationship with Ms. Scott, despite her

criminal record, when Mr. Jones was hired.").[35]

------

[35] "[T]he dissimilar treatment [that the plaintiff] received pre-opposition versus
post-opposition [wa]s not Mr. Jones's sole source of pretext." *Id.* at 1279. Mr. Jones also had
circumstantial evidence of the recommender's retaliatory animus towards another police officer

More particularly, as to pretext, "[t]he evidence presented by plaintiff[] is sufficient to allow a jury in the exercise of impartial judgment to conclude that [Medjet]'s proffered explanations are unworthy of belief." *MacPherson*, 922 F.2d at 776. Alternatively, a reasonable jury could equally conclude that Medjet's articulated reasons for firing Ms. Murdoch are legitimate and not a pretext for Title VII retaliation. Thus, for the foregoing reasons, the Court finds that Ms. Murdoch has met her pretext burden.[36]

Further, to the extent that the above proof does not satisfy the conventional *McDonnell Douglas* framework, the Court concludes that Ms. Murdoch has, nonetheless, "present[ed] circumstantial evidence that creates a triable issue concerning [Mr. Berger's retaliatory] intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citing *Holifield*, 115 F.3d at 1562); *Smith*, 644 F.3d at 1328 ("[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination [or retaliation] case."); *cf. also*

---

who the recommender wanted "to feel some pain" because she had filed a Title VII gender discrimination lawsuit against her employer. *Id.* at 1263, 1279.

[36] While demonstrating pretext is undoubtedly Ms. Murdoch's burden, the Court finds it telling that Medjet does not cite to any authority in which summary judgment was granted to the employer under circumstances comparable to these–a retaliation claim involving an alleged harasser who also was the sole person who made the decision to fire the plaintiff under an unwritten and subjective disciplinary policy.

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2017) ("That legal standard, to repeat what we wrote in *Achor* and many later cases, is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.") (emphasis added); *id.* (overruling *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011), and other cases "to the extent that they rely on 'convincing mosaic' as a governing legal standard").

Thus, the Motion is **DENIED** as to Count Two. Having addressed Ms. Murdoch's federal claims, the Court now turns to her remaining state-law counts and begins with those in which Ms. Murdoch seeks to hold Medjet and Mr. Berger jointly liable for tortious conduct.

### D. Invasion of Privacy (Count Four)

#### 1. Underlying Principles Governing Invasion of Privacy

Under Alabama law, there are four wrongs that can constitute invasion of privacy: (1) intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false but not necessarily defamatory position in the public eye; and (4) appropriation of some element of the plaintiff's personality for a public use. *Armstrong v. Standard*

*Furniture*, 197 F. App'x 830, 834 (11th Cir. 2006) (citing *Phillips v. Smalley Maintenance Servs., Inc.*, 435 So. 2d 705, 708 (Ala. 1983)). Ms. Murdoch's allegation is that her physical solitude or seclusion was intruded upon by Mr. Berger in violation of Alabama law. (Doc. 1 at 11 ¶ 55).

## 2. Summary Judgment Is Appropriate on Ms. Murdoch's Invasion of Privacy Claim.

The Alabama Supreme Court has held that <u>severe</u> sexual harassment can be an invasion of privacy. *See Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989). In *Busby*, the plaintiffs offered the following extensive evidence in support of their invasion of privacy claim:

> [The alleged harasser]: (1) invited Busby and Money to swim in his pool in the nude with him; (2) told Busby that his hands were cold and asked if he could put them in her pockets to keep them warm; (3) told the plaintiffs that he would "put a stick on their machines" so they could masturbate while working; (4) said that he could perform intercourse as fast as one of the machines at the plant could operate; (5) said that he wished that the plaintiffs would come to work braless and wear less clothing; (6) told one of the plaintiffs that if she had not stayed up all night having sex she could do her work properly; (7) told one employee that if she would give him 30 minutes with her that he would fill her pants in nine months for her; (8) acted as if he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands; (9) said that he should send one of the plaintiffs across the street to where a group of men were standing because she stayed sexually aroused all of the time; (10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated; (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts; (12) attempted to follow one of the

61

plaintiffs into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiffs one night; (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it; (15) openly stared at the plaintiffs' sexual anatomy; (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks; and (17) made other lewd remarks and gestures to the plaintiffs.

*Id.* Given this caliber of evidence, the Alabama Supreme Court found that "[a] jury could reasonably determine . . . that Deaton pried or intruded into the plaintiffs' sex lives in an offensive or objectionable manner and thereby invaded their right of privacy." *Id.*

The conduct that Ms. Murdoch relies upon to support her invasion of privacy claim is indisputably less severe and offensive than the evidence amassed in *Busby*. This is true even when the Court considers the full breadth of Ms. Murdoch's allegations–Mr. Berger's unwelcomed and welcomed (in the Title VII sense) behavior. Moreover, Ms. Murdoch's allegations do not show any physically-threatening or humiliating patterns. While Mr. Berger did touch Ms. Murdoch with his hugs and kisses and also pulled her elbow, this type of contact occurred infrequently (7-10 unwanted hugs, 2 kisses on top of her head, and 1 elbow tug) and she has presented no evidence that he ever physically contacted her in a sexually-demeaning or physically-painful manner.

Furthermore, the authorities cited by Ms. Murdoch fail to establish that she has

a triable invasion of privacy claim tied to her harassment allegations against Mr. Berger. (Doc. 25 at 20). *Cates v. Taylor*, 428 So. 2d 637 (Ala. 1983) is not a sexual harassment case. Instead, *Cates* involves a dispute about a cemetery lot. *Id.* at 638. Similarly, *Hogin v. Cottingham*, 533 So. 2d 525 (Ala. 1988) is unrelated to sexual harassment. Instead, *Hogin* involves a complaint about an attempt to discover a child's identity. *Id.* at 526.

Ms. Murdoch does cite to the sexual harassment case of *Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1376 (M.D. Ala. 1997). In *Johnson*, the court first determined that comments made about the plaintiff's appearance did not constitute a triable claim for invasion of privacy. *Id.* at 1397. In doing so, the *Johnson* court relied upon the privacy analysis in *Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1438 (M.D. Ala. 1996):

> [T]he court in *Brassfield* found that <u>comments about the plaintiff's dress, her breasts</u> and a nude portrait which she brought to work, a <u>request by the alleged harasser to sit in his lap</u> and the alleged harasser's agreement with another McLendon employee <u>who asked the plaintiff if she'd go skinny dipping</u> did not constitute prying into the private matters of the plaintiff's life. Under the *Brassfield* court's analysis, the comments made by Jordan about Johnson's appearance were not actionable.

*Johnson*, 987 F. Supp. at 1397 (emphasis added). Akin to *Johnson* and *Brassfield*, this Court concludes that Mr. Berger's compliments, other comments, and questions

about Ms. Murdoch's dating and marriages are inadequately intrusive to present a triable privacy claim under Alabama law.[37]

In particular, the Court finds that the record lacks evidence from which a reasonable jury could conclude that Mr. Berger's verbal acts "wrongful[ly] intru[ded] into [Ms. Murdoch]'s private activities in such a manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Brassfield*, 953 F. Supp. at 1456 (internal quotation marks omitted) (quoting *Hogin*, 533 So. 2d at 530-31); *cf. also id.* ("The Court notes that the inquiry in an invasion of privacy claim is similar to that made in an outrage claim.");[38] *id.* ("While conduct needed to support an invasion of privacy claim need not be 'extreme and outrageous,' in cases where a viable claim for invasion of privacy exists, the defendant's behavior frequently approaches such a degree.").

The *Johnson* court did determine that two separate incidents of touching were

---

[37] Here, it is important that Ms. Murdoch has no evidence that Mr. Berger ever sexually propositioned her. *Cf. Cunningham v. Dabbs*, 703 So. 2d 979, 982 (Ala. Civ. App. 1997) (finding a triable privacy claim in light of "sexual propositions and inappropriate physical contact"). She also has no evidence that Mr. Berger "made degrading personal comments to [her][.]" *Johnson*, 987 F. Supp. at 1397 (emphasis added) (citing *Kelley v. Troy State Univ.*, 923 F. Supp. 1494, 1503 (M.D. Ala. 1996)).

[38] As indicated in the beginning of the Court's analysis section, Ms. Murdoch agrees with Defendants that she lacks sufficient evidence to support a claim for outrage under Alabama law. (Doc. 25 a 24 n.3). In resisting the dismissal of her invasion of privacy claim, Ms. Murdoch has not explained what evidence makes her privacy claim viable even though it and outrage are essentially equal in the demanding level of proof required to present a triable issue.

"sufficiently intrusive" to constitute an invasion of privacy under Alabama law. *Id.*
at 1397. As the court described the facts applicable to the first incident:

> On 27 May 1994, Johnson was instructed by Jordan to meet him at the Shoney's Inn in Clanton to review certain documents regarding the apparent theft of two rifles, which had disappeared from the store earlier that day. Apparently, Jordan was living at the Shoney's Inn at that time. Johnson arrived there after 5:00 p.m.

> Once in his room, Jordan got a beer from a cooler and told Johnson that he did not have any paperwork but that he did want to discuss the missing rifles with her. Jordan told her that she did not have "to worry about [her] job" and to "[j]ust stay ..., sit down ... a while, calm down, and we'll discuss it." He also told her that her job was not in "jeopardy" and that he would "handle everything." Johnson got up to leave when Jordan wrapped his arms around her waist and told her that she could not leave the room crying.

> Johnson attempted to leave again but Jordan shut and locked the door. Johnson contends that Jordan pulled her toward the bed, telling her to sit and calm down. Jordan then told Johnson to "stay with him" and that "he would take care of everything." Johnson headed for the door a third time when Jordan attempted to hug and to kiss her. Johnson pushed him away and left the room.

987 F. Supp. at 1380 (emphasis added) (footnotes omitted).

The *Johnson* court summarized the allegations surrounding the second physical
incident:

> Jordan told Johnson in his office that her position was being eliminated. When she began to leave his office, he grabbed her and told her to sit down. Johnson testified in her deposition that although Jordan did not touch her affectionately she considered his touching a sexual overture because "[f]or no reason should he have touched [h]er."

987 F. Supp. at 1381 (emphasis added) (footnotes omitted).

Ultimately, this Court finds that Ms. Murdoch's allegations of 7-10 unwanted hugs, 2 kisses on top of her head, and 1 elbow tug are significantly unlike the physical-threatening conduct described in *Johnson* and are not cognizable as an invasion of privacy by Mr. Berger. *See Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1432, 1436 (M.D. Ala. 1998) (concluding that allegations of touching the plaintiff's buttocks, placing a hand inside her blouse, making "two sexually suggestive remarks[,]" giving her several unwanted hugs coupled with "moaning sounds[,]" and kissing her on New Year's Eve were inadequate to establish a viable invasion of privacy claim); *cf. also Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 711 (Ala. 1983) (finding that evidence of "subject[ing] [the plaintiff] to intrusive demands and threats, including an inquiry as to the nature of sex between her and her husband. . . . occurring two or three times each week[;]" "str[iking] her across the buttocks with his hand[;]" and "render[ing] her, in effect, an 'economic prisoner'" is sufficient to support a wrongful intrusion privacy claim); *Kelley*, 923 F. Supp. at 1503 (rejecting motion to dismiss privacy claim when the plaintiff's allegations included an assertion that the defendant "on several occasions . . . struck her, either with an open hand or a closed fist").

As a result of no viable invasion of privacy claim against Mr. Berger, Ms.

Murdoch also cannot maintain any dependent ratification claim against Medjet. (*See* Doc. 1 at 12 ¶ 56 (alleging ratification-based liability against Medjet for Mr. Berger's invasion of privacy)); *see also Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999) ("In order to show that the employer either implicitly 'ratified' or 'tolerated' sexual harassment by one of its employees, this Court stated [in *Potts v. BE&K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992)] that, *in addition to proving the underlying tortious conduct of an offending employee*, ….") (emphasis in *Stevenson*).

Therefore, the Motion is **GRANTED** as to Count Four.

### E.  Assault and Battery (Count Five)

#### 1.  Underlying Principles Governing Assault and Battery

Under Alabama common law, a plaintiff "alleging assault and battery must prove[:] (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Harper v. Winston Cty.*, 892 So. 2d 346, 353 (Ala. 2004) (internal quotation marks omitted) (quoting *Ex parte Atmore Comm. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998)). In *Atmore*, the plaintiff presented evidence indicating that the defendant "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg." 719 So. 2d at 1194. The

plaintiff also presented evidence indicating that "each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." *Id.* The *Atmore* court held that these factual assertions constituted substantial evidence that the defendant had committed a battery. *See id.*[39]

More often than not, the wrong in an assault and battery claim is not the actual touching, but the "manner or spirit in which [the touching] is done[.]" *See Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986) (internal quotation marks and emphasis omitted) (quoting *Singer Sewing Mach. Co. v. Methvin*, 63 So. 997, 1000 (Ala. 1913)). "Thus, to lay hands on another in a hostile manner is a battery, although no damage follows; but to touch another, merely to attract his attention, is no battery and not unlawful." *Id.* "[A]ctual injury to the body is not a necessary element" for an assault and battery claim. *Surrency*, 489 So. 2d at 1104. Additionally, when conflicting evidence exists on the occurrence of a battery, the question of whether a battery did occur is for the jury. *Id.* (citing *Britling Cafeteria Co. v. Shotts*, 162 So. 378 (1935)).

_____

[39] *Atmore* does not provide an example of when a plaintiff's evidence would be insufficient to support assault and battery when claiming that she was touched in a subjectively, sexually-offensive manner. *Atmore* also does not require that a plaintiff separately satisfy the offensiveness of any unwanted touching from an objective standpoint.

### 2. Ms. Murdoch's Assault and Battery Claim Is Not Triable Against Mr. Berger or Medjet.

Relying upon *Whitlow v. Bruno's, Inc.*, 567 So. 2d 1235, 1239 (Ala. 1990), Defendants contend that Ms. Murdoch's assault and battery claim fails because Mr. Berger's touchings were not "undertaken 'in rudeness or [in] anger.'" (Doc. 20 at 27 (alteration added to correctly reflect quoted source)). However, *Whitlow* is not a case involving allegations of sexual harassment and *Atmore* (which pre-dates *Whitlow*) indicates that the standard to apply is whether the touching was done in a harmful <u>or offensive</u> manner and whether the contact had a sexual overtone or connotation.

The parties' briefing on this claim provides the Court with little guidance. Defendants have not cited to a case which establishes that an assault and battery claim premised upon a supervisor's unwanted full-body hugs, kisses, and an elbow tug fail to present a triable issue. At the same time, Ms. Murdoch lacks any affirmative authority confirming that her facts are sufficient to let a jury decide the merits of this claim.

Here, Mr. Berger does not dispute that he intentionally hugged and kissed Ms. Murdoch. He also does not dispute that he pulled on her elbow. Thus, the two first elements are undoubtedly met.

Ms. Murdoch did not prevent any of Mr. Berger's hugs, kisses, or the pulling

of her elbow, although she did testify that she does not like being touched. (Doc. 21-3 at 37 at 141). Also, as to Mr. Berger's unwanted hugs more specifically, she would "conclude the hug [by] getting out of the embrace quickly." *Id.* Nonetheless, there is no evidence that Ms. Murdoch ever verbally objected to Mr. Berger's touchings when they occurred (or shortly thereafter). Finally, there is no evidence of a touching that had substantial sexual overtones. Even accepting the record in a light most favorable to Ms. Murdoch, the Court concludes that summary judgment is due to entered in Mr. Berger's favor. Consequently, the Motion is **GRANTED** as to Count Five with respect to Ms. Murdoch's battery claim against Mr. Berger.

As a result of no viable battery claim against Mr. Berger, Ms. Murdoch also cannot maintain any dependent ratification-based claim against Medjet consistent with *Stevenson* and *Potts* (as discussed in the invasion of privacy section above). Even if the Court were to find that Ms. Murdoch's assault and battery claim is triable as to Mr. Berger, it would nonetheless reach a different conclusion about Medjet's purported liability for this claim.

Medjet is liable for the intentional torts of Mr. Berger if: (1) the employee's acts are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the conduct. *See Potts*, 604 So. 2d at 400 (citing *Joyner v.*

*AAA Cooper Transportation*, 477 So. 2d 364, 365 (Ala. 1985)).

"The employer is vicariously liable for acts of its employee that were done for the employer's benefit, *i.e.*, acts done in the line and scope of employment or for acts done for the furtherance of the employer's interest. The employer is directly liable for its own conduct if it authorizes or participates in the employee's acts or ratifies the employee's conduct after it learns of the action." *Potts*, 604 So. 2d at 400. In the absence of an allegation that the conduct of Mr. Berger was done in furtherance of Medjet's business or in the line and scope of his employment as CEO,[40] Medjet is liable for the conduct of Mr. Berger only if it participated in, authorized, or ratified Mr. Berger's conduct. (*See* Doc. 1 at 12 ¶ 62 (alleging (only) that Medjet "ratified and condoned the unlawful acts of its agent and make employee, [Mr.] Berger, and is guilty of assault and battery")).

That is, Medjet is liable if:

[I]n addition to proving the underlying tortious conduct of an offending employee, a complaining employee . . . show[s] that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted

---

[40] Although Ms. Murdoch argues in opposition to the Motion that Mr. Berger's testimony regarding the creation of a culture of "flirtatious banter" at Medjet signifies that his tortious conduct was committed in the line and scope of his employment (doc. 25 at 23), she has not asserted that type of employer liability against Medjet in her complaint.

> sexual harassment and/or a continuing tort; and (3) that the employer
> failed to take "adequate" steps to remedy the situation.

*Id.* at 400 (emphasis added); *see also Stevenson*, 762 So. 2d at 824 ("In order to show

that the employer either implicitly 'ratified' or 'tolerated' sexual harassment by one

of its employees, this Court stated [in *Potts*] that, *in addition to proving the*

*underlying tortious conduct of an offending employee*, a complaining employee must

show that his or her employer [meets the *Potts* ratification factors set out immediately

above].") (emphasis in original); *id.* at 825 n.6 ("It is well settled that <u>Alabama does</u>

<u>not recognize an independent cause of action for sexual harassment</u>. Instead, claims

of sexual harassment are maintained <u>under common-law tort theories such as assault</u>

<u>and battery</u>, invasion of privacy, negligent training and supervision, and outrage.")

(emphasis added).

   "Adequate" steps are those which are reasonable and necessary to stop the

tortious conduct. *Potts*, 604 So. 2d at 401. The Alabama Supreme Court has held that

when an employer takes inadequate corrective action by failing to investigate or

reprimand the offending employee, that employer may be liable for the intentional

torts of an employee. *See Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889

(Ala. 1995) ("We hold that there is a genuine issue of material fact as to whether [the

employer] had 'actual knowledge' of [the harasser]'s alleged tortious conduct and as

to whether [the employer] 'ratified' [the harasser]'s conduct."). In contrast, when the specific intentional tortious conduct stops after "swift" corrective action by the employer, the Alabama Supreme Court has held that the corrective action is adequate as a matter of law and precludes any employer liability on the basis of ratification. *See Potts*, 604 So. 2d at 401 (summarizing adequate measures taken by employer to support the Alabama Supreme Court's holding in *Joyner*).

As an initial matter, the incidents involving Mr. Berger and other female employees of Medjet that it had notice of (like Ms. Rollins's allegations and, to some degree, Ms. Tidmore's) do not create a material factual dispute as to Medjet's ratification-based liability for Mr. Berger's alleged battery of Ms. Murdoch. As *Potts* makes clear, the notice necessary to potentially trigger ratification is "that the tortious conduct was directed at and visited upon the complaining employee[.]" *Id.* at 400 (emphasis added).

Here, it is undisputed that until June 2015 Medjet had no notice that Ms. Murdoch experienced any unwanted touching by Mr. Berger, even though the acts now complained of had occurred at least 2 months more than earlier that year. Further, by June 2015, all unwanted touching of Ms. Murdoch by Mr. Berger had ceased. Medjet cannot be held liable for failing to take corrective action of Mr. Berger's prior alleged misconduct that was disclosed to it by Ms. Murdoch after it

was no longer occurring. Otherwise, Medjet would be liable for an employee's tortious acts even though it never had notice and an opportunity to correct that conduct while it was a present problem.

Further, to the extent that there was a need for Medjet to take any corrective action to protect Ms. Murdoch after it received notice of her past allegations against Mr. Berger (dating back several months prior to her reporting date), she did not experience any unwanted touching by Mr. Berger for the remainder of her employment. Consequently, there is no evidence of an underlying tort committed by Mr. Berger to support Ms. Murdoch's ratification theory post-disclosure.

This Court is aware that the *Mardis* court held that a failure to investigate post-disclosure presented a triable issue as to that employer's liability for ratifying the alleged harasser's prior assault and battery, invasion of privacy, and outrage directed at the plaintiff. 669 So. 2d at 889. *Mardis* is significantly distinguishable, however, because there the employer accepted the harasser's report that the plaintiff had "quit that morning" (even though she disputed that fact), *id.* at 888, rather than investigate her timely allegations of current and ongoing harassment. *Id.* at 889; *cf. Potts*, 604 So. 2d at 401 ("[T]he question is whether Potts presented substantial evidence that the steps taken by BE & K, after learning of the continuous tortious conduct of Sanders, were not reasonably calculated to stop that conduct.") (emphasis added). Thus, it was

the employer's alleged one-sided actions in *Mardis* (attributable to disbelieving the plaintiff's version of events) that prevented a temporally-relevant investigation and implementation of an adequate remedy for the plaintiff. Here, Ms. Murdoch's substantial delay in reporting Mr. Berger's alleged batteries until well after they had ceased is what prevented Medjet from conducting any temporally-relevant investigation of her allegations. Under such circumstances, no reasonable jury could conclude that Medjet should be held liable for ratifying Mr. Berger's alleged assault and battery of Ms. Murdoch that occurred for a limited period of time more than several months prior to her reporting and never happened to her again post-reporting.

Thus, the Motion is **GRANTED** as to Count Five with respect to Ms. Murdoch's claim against Medjet for this additional and alternative reason.

### F. Negligent and/or Wanton Hiring, Retention, Training, and Supervision (Count Three)

#### 1. Underlying Principles Governing Negligent Training and Supervision

As the Supreme Court of Alabama explained the standard for evaluating an actionable negligent training and supervision claim in *Mardis*:[41]

---

[41] *Mardis* makes it clear that the framework for evaluating an employer's liability for alleged negligent training and supervision shares some commonality with but also differs from the approach used to assess ratification-based liability. *Compare id.* at 889 (discussing ratification framework), *with id.* at 889-890 (discussing negligent training and supervision framework); *see also id.* at 890 (finding plaintiff's evidence to "be sufficient to survive a summary judgment motion as to claims of liability based on [the employer]'s ratification of [the

In *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala. 1993), citing *Thompson v. Havard*, 285 Ala. 718, 723, 235 So. 2d 853 (1970), this Court stated that in the master and servant relationship, the master is held responsible for the servant's incompetency when notice or knowledge, either actual or presumed, of the incompetency has been brought to the master. For the master to be held liable for the servant's incompetency, it must be affirmatively shown that had the master exercised due and proper diligence, the master would have learned of the incompetency. This may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them. While specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant, to leave it to the jury to determine whether they would have come to the master's knowledge had the master exercised ordinary care.

669 So. 2d at 889 (emphasis added);[42] *see also Jemison v. Legacy Cabinets, Inc.*, No. 1:05-CV-1699-VEH, (Doc. 40 at 46-47) (N.D. Ala. Feb. 22, 2007) (applying *Mardis/Big B* standard to negligent training and supervision claim in sexual-harassment case); *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001) (applying *Mardis/Big B* standard to negligent training and supervision claim in lender-liability case).

Additionally, a viable negligent training and supervision claim is contingent

---

alleged harasser]'s conduct, but . . . insufficient to allow her to present this issue to a jury on the issue of negligent training and supervision").

[42] *Big B* has since been abrogated on other grounds by statute as stated in *Horton Homes, Inc. v. Brooks*, 832 So. 2d 44, 57 (Ala. 2001).

upon "proof of wrongful conduct of an employee." *Stevenson*, 762 So. 2d at 825; *see*

*id.* ("declin[ing] to extend [prior] holdings to recognize a cause of action based on an

employer's negligence or wantonness in investigating a claim, independent of proof

of wrongful conduct of an employee").

> **2.**  **Summary Judgment Is Appropriate on Ms. Murdoch's Negligent Training and Supervision Claim Against Medjet.**

As an initial matter, Ms. Murdoch's complaint alleges that Medjet was

negligent in its training and supervision of Mr. Berger who "actively discriminated,

harassed, retaliated and conspired against [Ms. Murdoch] on an ongoing basis." (Doc.

1 at 9 ¶ 45). Consistent with *Stevenson* and the holding in *Thrasher v. Ivan Leonard*

*Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002), this "Court finds that

[Ms. Murdoch] cannot maintain an action for negligent supervision, training, and/or

retention based upon conduct that is employment discrimination [or retaliation], <u>but</u>

<u>does not support a common-law tort</u>." (emphasis added).[43] *Cf. also Johnson v.*

---

[43] Here, Ms. Murdoch's counts against Mr. Berger are limited to common-law claims. Therefore, the potential exception to this common-law tort rule that is presented by virtue of the Alabama Age Discrimination in Employment Act (the "AADEA") is not an issue in this case. Consequently, this Court has no reason to revisit its ruling in *King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252 (N.D. Ala. 2014). *See id.* at 1269 (denying summary judgment in part "[i]n light of the court's decision to deny summary judgment on [the plaintiff]'s . . . discriminatory discharge claim [under the AADEA] and the legal uncertainty over whether the Supreme Court of Alabama would equate violations of the AADEA with wrongful conduct appropriate to support a negligent/wanton training theory under Alabama law").

*Brunswick Riverview Club, Inc.*, 39 So. 3d 132, 139 (Ala. 2009) (reasoning in its rejection of the plaintiff's negligent training and supervision claim tied to Alabama's Dram Shop Act that, Alabama "does not recognize a <u>common law cause of action</u> for negligence in the dispensing of alcohol." (emphasis added) (internal quotation marks omitted) (quoting *Ward v. Rhodes, Hammonds & Beck, Inc.*, 511 So. 2d 159, 164-65 (Ala. 1987))). Thus, to the extent that Ms. Murdoch has attempted to support her training and supervision claim against Medjet with something other than an Alabama common-law tort, she cannot do so as a matter of law.

Turning to an analysis of whether Ms. Murdoch's negligence claim connected to a common-law tort presents a triable issue, the Court looks first to Medjet's treatment of this count in its reply:

> <u>Medjet stands by the argument in its principal brief that there can be no viable negligence claim because [Ms.] Murdoch cannot establish any underlying tort claim</u>. In any event, Medjet was not negligent because it effectively managed [Ms.] Rollins'[s] complaint and because it was not placed on notice of the allegations of [Ms.] Pyron, [Ms.] Kerr or [Ms.] Tidmore, who failed to bring forth a complaint of their own.

(Doc. 28 at 10 (emphasis added)). Because no triable tort claims remain against Mr. Berger, the Court agrees with Medjet that Alabama law unambiguously precludes liability for any negligent training and supervision. *See Voyager Ins. Companies v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003) ("A party alleging negligent or wanton

supervision and hiring must also prove the underlying wrongful conduct of employees." (citing *Stevenson*, 762 So. 2d at 825)); *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008) (similar). Thus, the Court does not reach an analysis of Medjet's lack-of-notice reasoning offered in support of summary judgment on this claim.

Therefore, the Motion is **GRANTED IN PART** as to Count Three and otherwise **TERMED** as **MOOT**.

## V. CONCLUSION

For the reasons stated above, the Motion is **GRANTED IN PART** and otherwise **DENIED** as to Count One; **DENIED** as to Count Two; **GRANTED IN PART** and otherwise **TERMED** as **MOOT** as to Count Three; **GRANTED** as to Count Four; **GRANTED** as to Count Five; and **GRANTED** (with Ms. Murdoch's consent) as to Count Six. Accordingly, Counts One, Three, Four, Five, and Six are **HEREBY DISMISSED WITH PREJUDICE**. Additionally, with no pending claims remaining against Mr. Berger, he is **HEREBY DISMISSED WITH PREJUDICE** as a Defendant.

Finally, by separate order, the Court will set this case for a final pretrial conference on Ms. Murdoch's Title VII retaliation claim against Medjet.

**DONE** and **ORDERED** this 1st day of March, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge